IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
WESTERN DIVISION

| | | |
|---|---|---|
| M. RANDY RICE, TRUSTEE FOR JODY L. CLARK, | * | |
| | * | |
| | * | |
| Plaintiff, | * | |
| vs. | * | No. 4:12-cv-00108-SWW |
| | * | |
| | * | |
| UNION PACIFIC RAILROAD COMPANY, | * | |
| | * | |
| Defendant/Third-Party Plaintiff, | * | |
| | * | |
| vs. | * | |
| | * | |
| | * | |
| GUNDERSON RAIL SERVICES, LLC, D/B/A GREENBRIER RAIL SERVICES PINE BLUFF D/B/A GUNDERSON WHEEL SERVICES AND D/B/A GUNDERSON, INC. | * | |
| | * | |
| | * | |
| | * | |
| | * | |
| | * | |
| Third-Party Defendant. | * | |

OPINION AND ORDER

Plaintiff M. Randy Rice, Trustee for Jody L. Clark, brings this action under the Federal Employers' Liability Act (FELA), 45 U.S.C. § 51 *et seq.*, the Federal Railroad Safety Act (FRSA), 49 U.S.C. § 20101 *et seq.*, and the Federal Safety Appliance Act (FSAA), 49 U.S.C. § 20301 *et seq.*, for personal injuries Clark sustained in an accident while working as a switchman/brakeman for defendant Union Pacific Railroad Company (Union Pacific).[1]  Union

---

[1] After this action was filed, Clark filed for bankruptcy and moved to substitute Rice as the Plaintiff in this matter.  The Court granted Clark's motion but did not allow Clark to remain as a Plaintiff as he does not have standing to pursue this claim.  See *Vreugdenhil v. Hoekstra*, 773 F.2d 213, 215 (8th Cir. 1985) ("a debtor may not prosecute on his own a cause of action belonging to the estate unless that cause of action has been abandoned by the trustee."); *In re Griffin*, 330 B.R. 737, 740 (W.D. Ark. 2005) ("the only party who can pursue a claim on behalf of the bankruptcy estate is the trustee, thus the debtor lacks standing").

Pacific, in turn, has filed a third-party complaint for indemnity against Gunderson Rail Services, LLC, d/b/a Greenbrier Rail Services Pine Bluff d/b/a Gunderson Wheel Services and d/b/a Gunderson, Inc. (Gunderson), alleging that Clark's accident was the result of failure and negligence of Gunderson and that Gunderson is liable for Clark's loss under indemnity provisions in a Track Lease Agreement pursuant to which Gunderson leases track from Union Pacific.

By Opinion and Order entered May 15, 2012 [doc.#94], the Court denied as moot Union Pacific's motion for summary judgment on Count II of Plaintiff's complaint under the FSAA as Plaintiff withdrew Count II of his complaint, denied as premature Union Pacific's motion for summary judgment on its claim for indemnity against Gunderson under the Track Lease Agreement, granted in part and denied in part Plaintiff's motion for partial summary judgment, and denied the parties' six motions to exclude expert testimony.

Following the Court's ruling on the motions, the parties settled Plaintiff's claims for $1,150,000, with Union Pacific and Gunderson each agreeing to pay Plaintiff $575,000.[2] Because Union Pacific is responsible for Plaintiff's loss incurred as a result of violations of its non-delegable duty to furnish a safe workplace under FELA, see, *e.g.*, *Burlington Northern R. Co. v. Farmers Union Oil Co. of Rolla*, 207 F.3d 526, 532 (8th Cir. 2000) (noting that the primary

---

[2] The parties reached a settlement the weekend prior to trial and exchanged several emails confirming that settlement. However, a dispute soon arose concerning the terms of the settlement agreement and Plaintiff filed a motion to enforce settlement. Plaintiff and Union Pacific claimed a settlement had been reached, while Gunderson denied a settlement had been reached, at least on the terms as Union Pacific claimed them to be. The Court held a telephone conference on May 29, 2012, to resolve the parties' dispute and also addressed the issue during a pretrial conference on May 30, 2012. By Order and Judgment entered May 31, 2012 [doc.#'s 157, 158], the Court granted Plaintiff's motion to enforce settlement, finding that Plaintiff, Union Pacific, and Gunderson entered into a binding settlement agreement that resolved Plaintiff's claims.

purpose of an indemnity agreement such as is at issue here is to indemnify a railroad when its lessee's act or omission causes the railroad to violate its non-delegable duty to furnish a safe workplace under FELA), Gunderson, by agreeing to pay Plaintiff $575,000 of the settlement, or one-half of Union Pacific's liability, indemnified Union Pacific for that same amount. Accordingly, the only question remaining is whether Gunderson will be required to indemnifiy Union Pacific for the full amount of its liability or whether Gunderson can limit Union Pacific's recovery of indemnity to one-half of its liability by proving that Union Pacific was negligent and that its negligence contributed to Clark's accident.[3]  The Court held a bench trial on Union Pacific's indemnity claim beginning on May 30, 2012 and concluding on June 1, 2012.  This Opinion and Order constitutes the Court's findings of fact and conclusions of law pursuant to Fed.R.Civ.P. 52.[4]

## I.

At the time of his accident, Clark was a switchman working for Union Pacific.  Clark was part of a three man crew, which also included a foreman, Edward Lybrand, and an engineer, Tommy Morrison. They were the only Union Pacific employees whose job was to switch cars at the Gunderson facility in  Pine Bluff, Arkansas.  Union Pacific owned the tracks at the Gunderson facility and allowed Gunderson to use the tracks under a Track Lease Agreement.

---

[3] Contrary to Union Pacific's argument, there was never an agreement for Union Pacific to pay one-half of Plaintiff's settlement and then allow Union Pacific to seek indemnity from Gunderson for its part of the remaining $575,000 due Plaintiff and litigate whether that amount of indemnity would be one-half or all of the remaining $575,000.  Rather, there was one loss ($1,150,000) and the question before the Court is whether Union Pacific and Gunderson will pay equal parts of the loss or whether Gunderson will be solely responsible for the loss.  Union Pacific may not, in other words, seek 50% of the 50% that Gunderson is obligated to pay Plaintiff.

[4] This Opinion and Order was prepared without benefit of a certified transcript.

The Track Lease Agreement was drafted by Union Pacific and entered into by Union Pacific and Gunderson on June 20, 2000.  The Track Lease Agreement refers to Gunderson as "the Industry" and Union Pacific as "the Railroad."  Article 3 of the Track Lease Agreement governs maintenance of the leased track and provides in pertinent part as follows:

Article 3.　　<u>MAINTENANCE OF TRACK STRUCTURE,  RIGHT OF WAY AND TRACK APPURTENANCES</u>.

　　A.　　The Industry, at its sole expense, shall maintain the track structure consisting of the rail, ties, ballast and other Track material including any paving or planking work that may be needed.

*　 *　 *

　　C.　　The Industry at its sole expense, shall remove snow, ice, sand and other substances as needed to permit safe operation over the Track....

　　D.　　Maintenance work performed by the Industry shall conform to the Railroad's standards....

*　 *　 *

Exhibit B to the Track Lease Agreement sets forth certain terms regarding the parties' responsibility for safety and liability.  Section 2 of Exhibit B to the Track Lease Agreement addresses "SAFETY."  Section 2(c) governs walkways and provides that the "Industry, at its expense, shall provide and maintain a clear and safe pathway for Railroad employees along both sides of the Track. …" Section 2(d) provides that the "Industry shall have a non-delegable duty and responsibility to train and oversee its employees and agents as to proper and safe working practices while performing any work in connection with this Agreement, or any work associated with the Railroad serving the Industry over the Track."  Section 2(e), regarding intraplant switching, states that the "Industry shall not perform, permit or cause intraplant switching

-4-

without the prior written consent of the Railroad" and defines "intraplant switching" as "the movement of rail cars on the track by the Industry by any method and includes the Industry's capacity to move rail cars whether before, during or after any such movement."  Finally, section 2(f) requires the Industry to comply with "Standards," defined as "all applicable ordinances, regulations, statutes, rules, decisions and orders including, but not limited to, safety, zoning, air and water quality, noise, hazardous substances and hazardous wastes" which are "issued by any federal, state or local governmental body or agency (hereinafter "Authority")."  Section 2(f) further provides:

> If the Industry is not in full compliance with any Standards issued by any authorized Authority, the Railroad, after notifying the Industry of its noncompliance and the Industry's failure within twenty days of such notice to correct such noncompliance, may elect to take whatever action is necessary to bring the Track and any Railroad property into compliance with such Standards; PROVIDED, HOWEVER, that if Industry's failure to comply with Standards interferes with, obstructs or endangers Railroad mainline or yard operations in any way, Railroad may initiate compliance action immediately; and PROVIDED, FURTHER, nothing in this Agreement shall prevent Railroad from taking action to mitigate damages caused by Industry's noncompliance with Standards.  The Industry shall reimburse the Railroad for all costs (including, but not limited to, consulting, engineering, clean-up, disposal, legal costs and attorneys' fees, fines and penalties) incurred by the Railroad in complying with, abating a violation of, or defending any claim of violation of such Standards.  A waiver by the Railroad of the breach by the Industry of any covenant or condition of this Agreement shall not impair the right of the Railroad to avail itself of any remedy for any subsequent breach thereof.

Section 3 of Exhibit B to the Track Lease Agreement addresses "LIABILITY" and provides in pertinent part as follows:

Section 3.     <u>LIABILITY</u>.

(b) Except as otherwise specifically provided in this Agreement, all Loss related to the construction, operation, maintenance, use, presence or removal of the Track shall be allocated as follows:

(1) The Railroad shall pay the Loss when the Loss arises from or grows out of the acts or omissions of the Railroad whether or not a Third Person contributes to cause the Loss.

(2) The Industry shall pay the Loss when the Loss arises from or grows out of the acts or omissions of the Industry. The Industry shall also pay Loss when the Loss arises from or grows out of:

\* \* \*

(ii) the Industry's failure to construct or adequately maintain pathways or walkways as required by Section 2(c);

(iii) the Industry's failure to comply with Standards, as required by Section 2(f);

(iv) intraplant switching as defined by section 2(e); ...

\* \* \*

The Industry shall be liable under [(ii) through (iv)] regardless of whether the Railroad had notice of, consented to, or permitted the aforesaid impairments, failures, Standards, wastes or substances, and whether or not the Railroad or a Third Person contributed to cause the Loss.

(3) Except as otherwise more specifically provided in this Agreement, Railroad and Industry shall pay equal parts of the Loss that arises out of the joint or concurring negligence of the Railroad and the Industry, whether or not the acts or omissions of a Third Person contribute to cause the Loss....[5]

\* \* \*

---

[5] Union Pacific and Gunderson both agree that if the loss arises out of the joint or concurring negligence of Union Pacific and Gunderson, liability will be 50% each, even if one party is more at fault than the other.

On Monday, August 30, 2010, Clark and the other members of his crew were picking up three wheel cars from the Gunderson facility to bring back to the Union Pacific facility.  When Clark asked Morrison to "stretch," or move the train forward to make certain that the cars were coupled together, Clark realized that the last car on the track, AOK6445, was not coupled to the others.  Clark walked to the rear of Track 570 and he noticed that the drawbar on the last car was slued, or moved over to one side.  Standing water and mud were around the track and in-between the rails of Track 570; no ballast or railroad ties were visible.  Clark slipped in the mud in between the rails of Track 570 while attempting to manually align the drawbar, as he had been trained to do, and seriously injured his back.

Clark and the two other members of his crew all testified that they switch cars at the Gunderson facility on Mondays, Wednesdays, and Fridays, and that they had left three cars, including AOK6445, coupled together on the Friday before the Monday accident.  Union Pacific apparently has no switch activity records to confirm that the three cars were left coupled together the Friday before the accident.  There is, however, ample evidence that Gunderson frequently moves cars with forklifts in order to load and unload the cars at its facility and that Union Pacific was aware that Gunderson did this.  But there is little evidence that Gunderson had any need to move cars that were in the position of AOK6445 on Track 570, as cars in that location were not in the pathways of forklifts at the facility.  Usually Gunderson workers are not at the site on weekends.

Adjusting drawbars is something Clark anticipated doing every day as part of his job and he acknowledged that he knows about a tool called a "Knuckle Buddy" to assist in leveraging slued drawbars to effect a coupling of the cars, although he testified that he would not have used

such a tool in this instance as he always first tries to move a drawbar manually, which he said can be done easily on some cars.  What caused Clark to slip was not the movement of the car but the muddy conditions that existed between the rails at Track 570.  Clark acknowledged that in his training he was taught that he can refuse to work in dangerous conditions.

Under the terms of the Track Lease Agreement, Gunderson is required to maintain the track at its facility in accordance with Union Pacific standards.  Gunderson never asked for written standards from Union Pacific and Union Pacific never gave Gunderson written standards for track maintenance.  However, as was the case before the Track Lease Agreement, Gunderson would hire contractors to make repairs to the tracks when Union Pacific pointed out that such were required.  At one time before the accident, Union Pacific even stopped switching at Gunderson because some of the wheels and axles that Gunderson refurbishes were in positions that impaired clearance along the tracks.

Even though the lease requires it to do so,  Gunderson did not train its employees with respect to track maintenance or Union Pacific standards but, as already stated, would rely on Union Pacific to notify it of problems.  Gunderson's manager, Cliff Koonce, did not understand Gunderson's obligations under the Track Lease Agreement and had never seen the Track Lease Agreement before Clark's accident.

Union Pacific employees, including Clark and Lybrand, complained to the Union Pacific Safety Committee about the muddy conditions on Gunderson's tracks around June 2010, prior to the accident.  Union Pacific, however, did not notify Gunderson to do anything to correct the muddy conditions at Track 570.

The Federal Railroad Administration (FRA) has promulgated track safety standards for the maintenance and construction of a track. These standards, codified at 49 C.F.R. Pt. 213, require adequate ballast and slope for drainage along the track. "Excepted track," such as the Union Pacific track leading up to the switch at the Gunderson yard, must be inspected once a month for proper track gage and loose rails. There was testimony from a Union Pacific inspector that he inspects Gunderson track once a year and excepted track once a month. Another Union Pacific employee, James Smith, testified that when he is with FRA inspectors, they stop inspecting when they get to the Gunderson property.

## II.

### A.

Union Pacific is entitled to indemnification from Gunderson if it establishes that "an act or omission" of Gunderson caused the accident. *Burlington Northern, Inc. v. Bellaire Corp.*, 921 F.2d 760, 763 (8th Cir. 1990) (citing *Burlington Northern, Inc. v. Hughes Brothers, Inc.,* 671 F.2d 279, 284 (8th Cir.1982); *Missouri Pacific R.R. Co. v. International Paper Co.,* 618 F.2d 492, 496 (8th Cir.1980)). "[A]n 'industry's obligation to indemnify a railroad under an industrial track agreement is a contractual duty and not a duty arising under the common law of tort.'" *Id.* (quoting *Hughes Brothers,* 671 F.2d at 284). These contracts are made in contemplation of the railroad's liability under FELA, which subjects the railroad to liability for failure to furnish a safe workplace. *Id.* (citing *Hughes Brothers,* 671 F.2d at 283–284). In cases dealing with similar indemnity agreements, the Eighth Circuit has held that the primary inquiry is two-fold. *Id.* "First, the fact finder must determine 'if an act or omission of the industry caused the injury.'" *Id.* (quoting *Hughes Brothers,* 671 F.2d at 284). "'The phrase 'act or omission' includes any act

or omission which constitutes a violation of the railroad's duty to provide a safe workplace, and thus, subjects it to liability under [FELA].'" *Id.* "Second, if the industry's act or omission caused the injury, then the fact finder must determine whether the railroad is entitled to full or partial indemnity." *Id.* "The railroad may only recover one-half of its liability if 'the industry can prove that the railroad was negligent and its negligence contributed to the injury.'" *Id.* (quoting *Hughes Brothers,* 671 F.2d at 284–285). See also *Illinois Cent. Gulf R.R. Co. v. Crown Zellerbach Corp.,* 859 F.2d 386, 390–391 (5th Cir.1988) ("railroad must be found negligent under common law standards before its recovery from the indemnitor will be limited by the agreement to one-half of the underlying liability") (cited with approval in *Bellaire*, 921 F.2d at 763)).[6]

## B.

### 1.

The Court finds that Clark suffered an injury compensable under FELA that stemmed from muddy conditions at Track 570 and that Union Pacific has established, in accordance with the terms of the Track Lease Agreement, that acts or omissions by Gunderson caused the accident in which Clark was injured. Under the terms of the Track Lease Agreement, Gunderson is required to maintain the track at its facility in accordance with Union Pacific standards. Even though the Court is unable to find with certainty what those standards might be, Gunderson never asked for any written standards from Union Pacific. Gunderson has not trained its employees with respect to track maintenance or any other Union Pacific standards but has relied on Union Pacific to notify it of problems. Gunderson's manager did not understand Gunderson's

---

[6] Because Gunderson takes the position that it did not settle this action with Union Pacific and Plaintiff, see n.2, *supra*, the Court will consider the issues of Union Pacific's and Gunderson's liability as if there had been no settlement.

obligations under the Track Lease Agreement and had never seen the Track Lease Agreement before Clark's accident.  It is clear that Gunderson's acts or omissions caused Clark's accident and that this was an accident that violated Union Pacific's non-delegable duty under FELA to provide its employees with a safe place to work.  Gunderson is therefore required to indemnify Union Pacific for the loss.

2.

Before proceeding to the determination of whether Union Pacific was also negligent and whether its negligence contributed to Clark's accident, the Court addresses Union Pacific's argument that Gunderson is strictly liable under Section 3(b)(2)(ii),(iii), and (iv) of Exhibit B to the Track Lease Agreement.  As previously noted this section provides that Gunderson shall pay Loss when the Loss arises from or grows out of Gunderson's (ii) failure to construct or adequately maintain pathways or walkways as required by Section 2(c), (iii) failure to comply with Standards, as required by Section 2(f), or (iv) intraplant switching as defined by section 2(e).  This section further provides that Gunderson shall be liable under (ii) through (iv) "regardless of whether [Union Pacific] had notice of, consented to, or permitted the aforesaid impairments, failures, Standards, wastes or substances, and whether or not [Union Pacific] or a Third Person contributed to cause the Loss."

a.

Union Pacific argues that Gunderson did not maintain the walkways in accordance with FRA regulations setting forth track safety standards applicable to Track 570 and that it was this breach of its statutory duty that caused Clark's accident, making it strictly liable under Section 3(b)(2)(ii).  The Court disagrees.  Aside from the fact that Clark's accident was not a walkway

-11-

accident, the FRA regulations do not even apply to Track 570, a fact acknowledged by Union

Pacific's designated expert and corporate representative, James Smith.  "Although the FRA has

broad jurisdiction over anything that can be construed as a railroad (with the exception of self-

contained urban rapid transit systems), it has chosen, for practical purposes, to regulate

'something less than the total universe of railroads.'"  *Sapp v. CSX Transp., Inc.*, — Fed.Appx.

—, 2012 WL 1345733, at *5 (6th Cir. Apr. 19, 2012) (quoting 49 C.F.R. Pt. 209, App. A)).  In

this respect, the FRA regulations prescribe "minimum safety requirements for railroad track that

is part of the general railroad system of transportation."  49 C.F.R. § 213.1.  They expressly do

not apply to railroad track "[l]ocated inside an installation which is not part of the general

railroad system of transportation." 49 C.F.R. § 213.3(b)(1).

> For example, all of FRA's regulations exclude from their reach railroads whose
> entire operations are confined to an industrial installation (i.e., "plant railroads"),
> such as those in steel mills that do not go beyond the plant's boundaries.... Other
> regulations exclude not only plant railroads but all other railroads that are not
> operated as a part of, or over the lines of, the general railroad system of transportation....
>
> By "general railroad system of transportation," FRA refers to the network of
> standard gage track over which goods may be transported throughout the nation
> and passengers may travel between cities and within metropolitan and suburban
> areas. Much of this network is interconnected, so that a rail vehicle can travel
> across the nation without leaving the system. However, mere physical connection
> to the system does not bring trackage within it. For example, trackage within an
> industrial installation that is connected to the network only by a switch for the
> receipt of shipments over the system is not a part of the system.

49 C.F.R. Pt. 209, App. A (citations omitted).  It defies logic that the FRA would classify as

excepted track the Union Pacific Track 570 entering into the switch area right before the track

gets to the Gunderson facility and then, when the track enters the Gunderson property where the

cars travel 5 miles an hour (if that), all of a sudden the FRA regulations are in place.  As

previously noted, Smith testified that when he is with FRA inspectors, they stop inspecting when

they get to the Gunderson property, clearly because the inspectors treat it as something not subject to FRA regulations.  The Court finds that Track 570 is railroad track "[l]ocated inside an installation which is not part of the general railroad system of transportation," 49 C.F.R. § 213.3(b)(1), and that the FRA regulations at 49 C.F.R. Pt. 213 do not apply to Gunderson.[7]

b.

The Court additionally rejects Union Pacific's argument that Gunderson is strictly liable for failing to comply with "Standards" under Section 3(b)(2)(iii), which is defined as "all applicable ordinances, regulations, statutes, rules, decisions and orders including, but not limited to, safety, zoning, air and water quality, noise, hazardous substances and hazardous wastes" which are "issued by any federal, state or local governmental body or agency...."  Union Pacific argues that the muddy conditions at Track 570 violated standards of the Occupational Safety & Health Administration (OSHA) or the Arkansas Department of Labor.  The Court, however, is not aware that any regulatory agency or other government body has claimed that Gunderson violated any of its standards with respect to Clark's accident, and the Court finds Union Pacific has not established by a preponderance of the evidence that Gunderson violated standards of OSHA or the Arkansas Department of Labor.

c.

Finally, the Court rejects Union Pacific's argument that Gunderson is strictly liable for intraplant switching under Section 3(b)(2)(iv), which is defined as "the movement of rail cars on

---

[7] Union Pacific suggests that Appendix A of Part 209 can override the specific regulations but a Track Safety Standards Guidance Manual relied upon by Union Pacific in its motion for summary judgment against Gunderson [doc.#54] states that "[because it is a policy statement, Appendix A of Part 209 cannot override the text of [the track safety standards], which clearly excludes plant railroads from the reach of the track regulations."  The Court agrees that the specific text of the regulations are controlling.

the track by the Industry by any method and includes the Industry's capacity to move rail cars whether before, during or after any such movement." As previously noted, Clark and the two other members of his crew all testified that they had left three cars, including AOK6445, coupled together on the Friday before the Monday accident and Union Pacific has not proved that Gunderson was responsible for the cars being uncoupled. But even if Gunderson were responsible for the cars being uncoupled, the fact that Clark had to adjust the drawbars is not in and of itself dangerous. Adjusting drawbars is something Clark anticipated doing every day as part of his job. What caused Clark to slip was not the movement of the car, or intraplant switching, but the muddy conditions that existed between the rails at Track 570.

3.

Having determined that acts or omissions of Gunderson caused Clark's accident and that Gunderson is not strictly liable under the Track Lease Agreement, the Court must now determine whether Union Pacific is entitled to full or partial indemnification. The Court finds that Union Pacific may only recover one-half of its liability as Gunderson has proven that Union Pacific was also negligent and that its negligence contributed to Clark's accident.[8]

Although he knew he could refuse to work in dangerous conditions, Clark failed to use ordinary care for his own safety by attempting to maneuver to couple the cars in the mud between the rails at Track 570. As an agent or employee of Union Pacific, Clark's acts or omissions are imputed to Union Pacific. *Okvat v. Penn Cent. Transp. Co.*, 438 F.Supp. 658 (W.D.N.Y. 1977); *Swan v. New Orleans Terminal Co.*, 745 So.2d 52 (La.App. 4 Cir. 1999). In addition, Union Pacific employees told Union Pacific's safety committee about the muddy

---

[8] Common law components of negligence in the context of FELA include duty, breach, foreseeabilty, and causation. *Adams v. CSX Transp., Inc.*, 899 F.2d 536, 539 (6th Cir. 1990).

conditions at the Gunderson facility, but nothing was done to remedy the situation.  Section 2(f) of Exhibit B to the Track Lease Agreement provides that "[i]f the Industry is not in full compliance with any Standards issued by any authorized Authority, the Railroad, after notifying the Industry of its noncompliance and the Industry's failure within twenty days of such notice to correct such noncompliance, may elect to take whatever action is necessary to bring the Track and any Railroad property into compliance with such Standards...."  Union Pacific clearly knew of the condition of the tracks, and knew or should have known that Gunderson's manager knew very little or nothing about track maintenance, railroad standards, ballast, slopes, or grades.  Union Pacific's knowledge of the dangerous conditions at Track 570 is of sufficient character and quality to show that it acted negligently, *Crown Zellerbach,* 859 F.2d at 391, and Gunderson has established acquiescence on the part of Union Pacific, which is established by "the long continued awareness of a dangerous situation by the indemnitee without either taking any corrective measure or calling upon the indemnitor to do so."  *Hughes Brothers,* 671 F.2d at 286 (quoting *Pennsylvania R.R. Co. v. Erie Ave. Warehouse Co.*, 302 F.2d 843, 848 (3rd Cir. 1962)).

Union Pacific, however, argues that in *Nabholz Construction Corp. v. Graham*, 319 Ark. 396, 403-404, 892 S.W.2d 456, 460-461 (1995), the Arkansas Supreme Court "explicitly" declined to adopt the doctrine of acquiescence and that this doctrine is thus inapplicable to the Track Lease Agreement and the contractual duties therein.  Union Pacific misrepresents the holding of  *Nabholz.*  While the Arkansas Supreme Court in *Nabholz* did note that it had never adopted the doctrine of acquiescence and that the concept had "no relevance to the circumstances of the present case," the Court distinguished the case before it from cases dealing with railroad sidetrack agreements and FELA.  319 Ark. at 403-404, 892 S.W.2d at 460-461.  In this respect,

the Arkansas Supreme Court specifically noted that the Eighth Circuit's importation of the tort concept of acquiescence into a set of contractual duties was in the context of specific federal law (FELA) and particular factual circumstances (railroad spur-track accidents) and that "[t]he present situation is simply not comparable." *Id*. *Nabholz*, then, a non-FELA case, essentially excepted FELA cases from its disallowance of the doctrine of acquiescence in ordinary contract cases.  Union Pacific's reliance on *Nabholz* as precluding the application of acquiescence in this FELA action is simply misplaced.[9]

The Court recognizes that the Eighth Circuit has distinguished those leases containing a clause specifying that the railroad's knowledge of a dangerous condition did not waive its right to indemnification from its lessee for damages arising out of a violation of the lease.  *Rouse v. Chicago, Rock Island and Pacific R.R. Co.*, 474 F.2d 1180, 1183 n.1 (8th Cir. 1973) (citing *Anthony v. Louisiana & Arkansas Ry. Co.*, 316 F.2d 858 (8th Cir. 1963)).  But even if Gunderson were strictly liable under Section 3(b)(2)(ii),(iii), or (iv) of Exhibit B to the Track Lease Agreement, Gunderson also was negligent as set forth under section II.B.1. of this Opinion and Order and that negligence was independent of any violations of Section 3(b)(2)(ii),(iii), or (iv). Likewise, the negligence of Union Pacific that contributed to Clark's accident–namely, the imputation of Clark's acts or omissions to Union Pacific as well as Union Pacific's knowledge of dangerous conditions at Track 570 and its failure to remedy the situation or require Gunderson to do so–was also independent of any violations of Section 3(b)(2)(ii),(iii), or (iv).  Accordingly, the Court would in any case find that Union Pacific may only recover one-half of its liability as

_____

[9] The Arkansas Supreme Court obviously recognized that FELA cases adjudicated in state courts are governed by federal substantive law.  *St. Louis Southwestern Ry. Co. v. Dickerson*, 470 U.S. 409, 411 (1985).

Gunderson has proven that Union Pacific was also negligent, independent of any violations of Section 3(b)(2)(ii),(iii), or (iv) of Exhibit B to the Track Lease Agreement, and that its negligence contributed to Clark's accident.

III.

In sum, acts or omissions of Gunderson caused Clark's accident, Gunderson is not strictly liable under the Track Lease Agreement, and the negligence of Union Pacific contributed to Clark's accident.  As Gunderson has already agreed and been ordered to pay $575,000 of the settlement in indemnification–one-half of the loss–Union Pacific is not entitled to further indemnification from Gunderson.  Accordingly, Union Pacific and Gunderson must pay equal parts of the $1,150,000 settlement to Plaintiff.

IT IS SO ORDERED this 8th day of June 2012.

/s/Susan Webber Wright
UNITED STATES DISTRICT JUDGE